IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RONALD ARMBRESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-cv-77-JTA |
| | ) | |
| CORIZON, LLC, et al., | ) | (WO) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Pro se Plaintiff, Ronald Armbrester, who is no longer confined, filed this civil rights action pursuant to 42 U.S.C. § 1983, seeking relief for alleged violations of his federally protected rights. This action involves a dispute over the adequacy of medical care and treatment afforded Plaintiff during his incarceration at Easterling Correctional Facility ("Easterling"), in Clio, Alabama. Docs. No. 1, 49, 59. Plaintiff alleges Defendants delayed replacing his heart defibrillator, resulting in a medical emergency in which Plaintiff "went into cardiac arrest" with a heartbeat of 230 beats per minute and causing his defibrillator to use "the last of its reserved power to stop [Plaintiff] from a massive heart attack." Doc. No. 1 at 5.

Plaintiff names as the defendants: (1) Wexford Health Sources, Inc. ("Wexford"); (2) Dr. Jean Darbouze; (3) Dr. Philip Wilson; (4) Corizon, LLC ("Corizon"); (5) Dr. Richard Perryman; (6) Dr. Hugh Hood; and (7) Richard Hallworth, former Chief Executive

Officer of Defendant Corizon.  Docs. No. 1, 49, 59.[1]  Plaintiff asserts the defendants were deliberately indifferent to his serious medical needs and requests injunctive relief and monetary damages as relief. Doc. No. 1 at 13.

Because six of the seven named defendants argue the affirmative defense of exhaustion, this Opinion solely addresses that argument as raised by Defendants Wexford, Darbouze, Wilson, Perryman, Hood, and Hallworth (collectively "Defendants"). The Court treats Defendants' responses raising the affirmative defense as motions to dismiss.  Doc. No. 9 at ¶ 32; Doc. No. 69 at ¶ 32; Doc. No. 70 at ¶ 32; Doc. No. 73 at ¶ 32; Doc. No. 120 at ¶ 33.  The Court analyzes Defendant Corizon's special report, construed as a motion for summary judgment, by separate opinion.[2]

Defendants filed an answer, special report, supplemental special reports, responses, and supporting evidentiary materials addressing Plaintiff's claims for relief.  Docs. No. 9, 14, 15-1, 20, 63, 64, 66, 69, 70, 73, 80, 85, 87, 120.  In these documents, Defendants deny they acted in violation of Plaintiff's constitutional rights.  Defendants further argue the allegations asserted against them are due to be dismissed because, prior to filing this cause of action, Plaintiff failed to properly exhaust the administrative remedy available to him at Easterling regarding the claims presented in the Complaint.  Doc. No. 9 at 7; Doc. No. 20-1 at 4; Doc. No. 69 at 7; Doc. No. 70 at 7; Doc. No. 73 at 7.  Defendants base their

---

[1] On March 25, 2020, this Court directed the Clerk to amend the court docket to reflect Defendant "Corizon Health Services" to be correctly identified as "Corizon, LLC."  Doc. No. 13.  Further, on April 23, 2020, District Court Judge W. Harold Albritton adopted this Court's Recommendation, terminating Defendant Alabama Department of Corrections with prejudice.  Doc. No. 41.

[2] It appears that Plaintiff has abandoned his claims against all the defendants except for Wexford.  *See* Doc. No. 116. For the sake of completeness, the Court addresses the claims raised by Plaintiff against all the defendants.

exhaustion defense on Plaintiff's failure to follow the available required administrative procedures at Easterling regarding the claims presented in his complaint. *Id.*

The Court provided Plaintiff an opportunity to file a response to Defendants' answers and special reports in which he was advised, among other things, to address Defendants' argument that "he failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA")." Doc. No. 21 at 1; Doc. No. 89 at 1.

The orders advised Plaintiff that his response should be supported by affidavits or statements made under penalty of perjury and other evidentiary materials. *See* Docs. No. 21, 89. These orders further cautioned Plaintiff that unless "sufficient legal cause" is shown within ten days of entry of this order "why such action should not be undertaken, ... the court may at any time [after expiration of the time for his filing a response to this order] and without further notice to the parties (1) treat the special report and any supporting evidentiary materials as a [dispositive] motion ... and (2) after considering any response as allowed by this order, rule on the motion in accordance with the law." Doc. No. 21 at 3-4; Doc. No. 89 at 3-4. Plaintiff has filed numerous responses to Defendants' special reports. *See* Docs. No. 45, 46, 51, 94-100.

Pursuant to the Court's Orders (Docs. No. 21, 89), the Court deems it appropriate to treat the report and responses filed by Defendants as motions to dismiss pertaining to the exhaustion defense and resolves these motions in favor of Defendants. *Bryant v. Rich*, 530 F.3d 1368, 1374-1375 (11th Cir. 2008) (internal quotations omitted) ("[A]n exhaustion defense ... is not ordinarily the proper subject for a summary judgment [motion]; instead,

it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."); *see also Trias v. Florida Dept. of Corrections*, 587 F. App'x 531, 534 (11th Cir. 2014) (District court properly construed defendant's "motion for summary judgment as a motion to dismiss for failure to exhaust administrative remedies....").[3]

## I.    Plaintiff's Allegations

Plaintiff alleges, in February 2013, he was diagnosed with a heart disorder, requiring insertion of a St. Jude defibrillator implant.  Doc. No. 1 at 8. To monitor his implant and heart condition, Plaintiff explains he was provided a defibrillator monitor.  *Id*.  Plaintiff alleges, after his incarceration in June 2013, while housed at Kilby Correctional Facility, Kilby staff "displaced" Plaintiff's monitor and the monitor was lost.  *Id*.

Plaintiff was later transferred to Fountain Correctional Facility, and in August 2016, was taken to the Health Care Unit due to an accelerated heartbeat and high blood pressure. *Id*. at 9.  Plaintiff alleges his blood pressure remained high while incarcerated at Fountain. *Id*.

In January 2017, Plaintiff was transferred to Easterling.  *Id*.  Plaintiff alleges Defendant Corizon, the contract medical provider and Defendant Darbouze, a physician at Easterling, knew of Plaintiff's implant, and while Defendant Darbouze told Plaintiff a monitor would be ordered, Plaintiff never received a replacement for his lost St. Jude monitor.  *Id*.

---

[3] Upon consent of the parties, the case was referred to the United States Magistrate Judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c).  Doc. No. 118.

Approximately one year later, in January 2018, Plaintiff maintains, notwithstanding Defendant Perryman's knowledge of Plaintiff's recurrent chest pain, Defendant Perryman delayed or failed to monitor Plaintiff's implant.  Doc. No. 49 at 2.

Plaintiff alleges in 2019, after Defendant Wexford replaced Defendant Corizon as the medical care provider for the Alabama Department of Corrections ("ADOC"), Defendant Wilson also learned of Plaintiff's implant and its import to Plaintiff's health. Doc. No. 1 at 9-10.

Plaintiff maintains, Defendants' deliberate indifference and failure to monitor his implant led to a medical incident on December 22, 2019, in which he went into cardiac arrest.  *Id*. at 5.  Plaintiff asserts Defendants, "had prior knowledge that [Plaintiff] had a [serious] medical need[] that was delayed, ignored that the [defibrillator] had to be monitored, changed at [an] appropriate time, that the device was riding on reserved power for almost (2) years and had a dead line to be changed because the battery life had reach[ed] its exspected in [sic], and went unattended, unnoticed, and unevaluated."  Doc. No. 49 at 2.  Plaintiff appears to allege, in part, Defendants' failure to properly monitor his implant was caused by Defendants Corizon and Wexford's cost-saving policies or customs.  *Id*. at 1.

Defendants deny Plaintiff's allegations of deliberate indifference and unconstitutional policy or custom.  Defendants further maintain Plaintiff's claims are barred for Plaintiff's failure to exhaust his administrative remedies while confined at Easterling.

## II.    Factual Background

In April 2013, an implant device was placed in Plaintiff's chest.  Doc. No. 20-3 at

3; Doc. No. 20-4 at 54.[4]  On August 5, 2013, Plaintiff was incarcerated with the ADOC.

Doc. No. 20-3 at 2.  The next day, Plaintiff received a chest x-ray.  Doc. No. 20-3 at 4-6;

*see also* Doc. No. 20-4 at 72.  The radiologist read the x-rays as follows:

> Exam: Chest – 1 view (AP)
>
> Results:    The lungs are clear without evidence of focal pneumonia,
> pneumothorax, edenopathy or effusion.  The cardiomediastinal contours and
> bony structures are within normal limits.  No acute or chronic rib fractures.
> No mid-line shift of structures identified.  There is a pacemaker in position.
>
> Conclusion:    Clear lungs without evidence of acute cardiopulmonary
> findings.

Doc. No. 40-4 at 72.

Since his incarceration, Plaintiff has been treated by the ADOC chronic care clinic.

Doc. No. 20-3 at 3; *see also* Doc. No. 20-4 at 33.  To treat and monitor his heart condition,

Plaintiff has been seen regularly by ADOC medical staff and outside physicians.  *See*

*generally*, Doc. No. 20-4.

In December 2016, Defendant Darbouze, previously employed by Defendant

Corizon as the Medical Director at Easterling, left his employment.  Doc. No. 20-2 at 1.

Defendant Darbouze has not been employed at Easterling in any capacity as a medical

doctor since December 2016.  *Id*. at 2.

Plaintiff's medical records show, on August 15, 2017, medical personnel signed a

---

[4] Doc. No. 20-3 is Defendant Wilson's affidavit.  Defendant Wilson's testimony as to Plaintiff's medical history is
supported by Plaintiff's uncontroverted medical records.

"Refusal of Clinical Services" form due to Plaintiff's failure to appear for two chronic care medical appointments scheduled for August 7, 2017, and August 14, 2017.  Doc. No. 20-4 at 85.

On January 8, 2018, medical personal again signed a "Refusal of Clinical Services" form due to Plaintiff failing to appear for two chronic care medical appointments scheduled for December 18, 2017, and January 8, 2018.  Doc. No. 20-4 at 84.

On January 12, 2018, Plaintiff's medical records show that Defendant Perryman, then Easterling's Medical Director, ordered Plaintiff a nuclear medicine cardiac stress test. Doc. No. 20-3 at 3; *see also* Doc. No. 20-4 at 43-45.  "The note reflects that [Plaintiff] had a 10 day history of recurrent chest pain.  [Plaintiff] had no relaxed chest pain.  An EKG was taken."  Doc. No. 20-3 at 3; *see also* Doc. No. 20-4 at 45.

On February 5, 2018, Plaintiff was seen by an outside physician at River Region Cardiology.  Doc. No. 20-3 at 4; *see also* Doc. No. 20-4 at 40-41.  The cardiologist noted:

Exercise stress report with gaited spect nuclear imaging.

Stress procedure:  Patient's resting heart rate was 60 beats per minute. Resting blood pressure was 149/68.  Resting EKG showed an A-sensed, V-placed rhythm.  Patient was then exercised on a Bruce protocol.  He was able to exercise for 7 minutes.  He reached a peak heart rate of 162 beats per minute, which is 94% of his age predicted maximal heart rate.  At peak exercise, he did not report any chest pain.  At peak exercise, we did not observe any EKG changes to indicate ischemia.  Isolated PPCs were observed during the test. Myoview was injected at 6 minutes into the exercise.

Impression:
1. Clinically negative stress test.
2. Electrically negative stress test.
3. Myoview images are pending.  The report will be dictated separately.

Doc. No. 20-4 at 41.  The nuclear camera/imaging notations from that same date, state as

follows:

> Nuclear camera/imaging: IS2 Pulse with mirage processing.
>
> Previous nuclear:
>
> Nuclear procedure:  Resting images were acquired after injecting the patient
> with 4.04 mCi of Thallium 201.  Resting images show uniform uptake of the
> tracer by all Myocardial segments except the inferior wall and apex, which
> shows a large, mild-intensity defect.  Post-exercise images required after
> injecting the patient with a 33.4 mCi of Tc 99 myoview.  Post-exercise
> images again show a large inferior wall defect, which is moderate to severe
> intensity.  A gaited analysis shows an injection fraction of 46%.  Wall motion
> analysis shows mild to moderate global hypokinesis.
>
> Impression:
>
> 1. A large fixed inferior wall defect is noted, which may possibly represent a
> scar from a previous myocardial infarction.  Know that the segments were
> also mild-to-moderate hypokinetic.  We did not see any degree of
> reversibility to suggest ischemia.
> 2. Mild to moderate global hypokinesis.
> 3. An ejection fraction of 46%.

*Id.* at 40.

On March 14, 2018, Plaintiff was scheduled to meet an outside physician.  Doc. No.

20-4 at 83.  Because Plaintiff failed to report to the Health Care Unit, however, this

appointment was cancelled.  *Id.*

On April 1, 2018, Defendant Wexford became the ADOC's contract healthcare

provider to provide medical care to incarcerated Alabama state inmates and on February

21, 2019, Defendant Wilson became the Medical Director at Easterling.  Doc. No. 20-1 at

1-2; Doc. No. 20-3 at 2.

On March 6, 2019, Plaintiff filed a medical grievance regarding medications

allegedly not provided to him at pill call.  Doc. No. 20-1 at 2, 6.  Plaintiff received the following response to his grievance on March 8, 2019: "Thank you for bringing this to our attention.  This [] will be investigated.  I do apologize for any inconvenience and any delay.  Please let me know if this issue continues.  Have a blessed day."  Doc. No. 20-1 at 6.

On July 27, 2019,[5] Plaintiff completed a medical grievance relating to his health care code within the ADOC system.  Doc. No. 20-1 at 2, 7.  Plaintiff received the following response to his grievance on July 31, 2019: "Yes, the Provider did change your healthcare code at a "1."  Unfortunately, it wasn't changed in the computer.  It has been changed today.  I do apologize for the delay.  Have a blessed day!"  Doc. No. 20-1 at 7.

Plaintiff's medical records show, at approximately 12:36 p.m. on December 21, 2019, Plaintiff reported to Easterling's Health Care Unit, complaining of chest pains.  Doc. No. 20-4 at 76.  Defendant Wilson referred Plaintiff to Dale Medical Center in Ozark, Alabama for treatment.  Doc. No. 14-1 at 6.  Shortly thereafter, Plaintiff was transferred to Dale Medical Center.  Doc. No. 20-4 at 60, 77.

At approximately 2:43 p.m., Plaintiff was seen and examined by Dale Medical Center's emergency room physicians.  Doc. No. 14-1 at 2; *see also* Doc. No. 20-4 at 66.  Plaintiff was deemed to have an "emergency medical condition," "requiring emergency evaluation, treatment and/or stabilization."  Doc. No. 14-1 at 10.

The radiology report asserts the following findings as to Plaintiff's chest:

Chest 1 View

Reason for Procedure(s): Syncope

---

[5] While Plaintiff dated this grievance as July 27, 2018, upon review of the grievance, the accurate year is 2019.

Chest, Single View:

Findings: Left subclavian approach pacing device is in expected position.
The lungs are clear.  The heart size is normal.

Impression: No acute findings.

Doc. No. 20-4 at 66.  While at Dale Medical Center, Plaintiff also received a CT for his

"Head/Brain."  *Id*. at 67.  The radiology report asserts as follows:

CT Head/Brain W/O Contras

Reason for Procedure(s): Syncope

CT SCAN OF THE BRAIN WITHOUT CONTRAST:

Findings:  No intracranial mass, mass effect, hemorrhage, hydrocephalus,
extraaxial fluid collection or acute CVA.  Calvarium is intact.  Mastoid air
cells and sinuses are clear.

Impression: No acute intracranial abnormality.

All CT Scans performed at this location utilize dose optimization techniques
as appropriate to the performed exam.

*Id*.  Plaintiff returned to Easterling that same day.  Doc. No. 14-1 at 3; Doc. No. 20-4 at 66.

On January 17, 2020, Plaintiff was sent to see a cardiology expert.  Doc. No. 14-1

at 3, 13.  The report from the cardiologist states as follows:

Review of case

    (1)    ICD shock-device interrogation showed VFIB

    (2)    Hypertension

    (3)    Ischemic cardiomyopathy

    (4)    End of life battery on ICD

Doc. No. 14-1 at 3, 12.   The cardiologist provided the following diagnosis and prescriptions:

-   Change aspirin 8 mg. PO daily.

-   Atona Statin 40 mg. PO daily.

-   Change Losagtan to 50 mg. PO daily.

-   Start Metoprolol XL 50 mg. PO daily.

-   Echocardiogram for ischemic cardiomyopathy.

-   Schedule for ICD generator change w/Dr. Ahmed ASAP.

-   No institutional work/job.

-   Needs ICD remote monitor.

*Id*. at 3, 12.  Plaintiff returned to Easterling that same day.  *Id*. at 3, 15.  Plaintiff saw Defendant Wilson three days later, who approved all recommendations made by the cardiologist.  *Id*. at 3, 12.

On January 27, 2020, Plaintiff signed the instant Complaint, alleging deliberate indifference to his serious medical needs.  *See* Doc. No. 1 at 13.  Plaintiff's complaint was filed in this Court on February 3, 2020.  *Id*.

Also on February 3, Plaintiff complained to Easterling medical personnel that he suffered palpitations.  Doc. No. 14-1 at 4, 16.  The notes from Plaintiff's medical records show that Plaintiff mentioned that his issues "could be anxiety related" and that his vital signs were normal.  *Id*. at 4, 16.

The next day, Plaintiff completed a medical grievance relating to his defibrillator

and a medical incident that occurred on December 27, 2019.[6]   Doc. No. 20-1 at 2, 8. In his

grievance, Plaintiff alleges:

> On December 27, 2019, [Plaintiff's] heart rate according to the cardiologist
> report that his heart rate was 230 beats a minute, in danger of a massive heart
> attack.  The cardiologist call[ed] a St. Jude representative on 1-17-2020 and
> he did a check of the St. Jude [defibrillator] that had been place[d] in
> [Plaintiff's] chest on 2-27-2013 and the test results found that [Plaintiff's]
> [defibrillator] implant was riding on a reserved power for almost 2 years and
> was out of power on a last attempt to regulate [Plaintiff's] heart with last of
> its power to put [Plaintiff's] heart back in rhythm, the cardiologist told
> [Plaintiff] that [Plaintiff] could have died from a fatal heart attack, and [his]
> dead [defibrillator] put [him] at risk of a massive heart attack.  2-4-2020
> [Defendant Wilson] said that [Plaintiff] could have rode [sic] on a dead
> [defibrillator] for three (3) years before it had to be replaced.  [Plaintiff] told
> him that [Plaintiff] was in fear of [Plaintiff's] life and had thought of writing
> [Plaintiff's] last will in testament on the 4th of February 2020.

Doc. No. 20-1 at 8.

On February 5, 2020, Plaintiff's ICD generator was changed by Dr. Ahmed at River

Region Cardiology.  Doc. No. 14-1 at 4, 17.  Plaintiff was discharged from Easterling's

infirmary the next day.  Doc. No. 20-4 at 88.  On February 6, 2020, Easterling medical

personnel directed Plaintiff to avoid heavy lifting and excessive use of his left arm for two

weeks and to sleep in a bottom bunk for six months.  Doc. No. 20-4 at 56-57.

On February 10, 2020, Plaintiff was transferred to River Region Cardiology for an

"Echo and ICD remote monitor."   Doc. 14-1; *see also* Doc. No. 20-4 at 63.   The

echocardiogram report provides the following summary:

> Reason for Study: Ischemic cardiomyopathy

> Interpretation Summary

---

[6] While Plaintiff asserts the date of the alleged medical incident to be December 27, 2019, it appears from the record, that this grievance relates to Plaintiff's medical treatment on December 21, 2019.

A complete two-dimensional transthoracic echocardiogram was performed (2D, M-mode, Doppler and color flow Doppler).

The left ventricular ejection fraction is approximately 45-50%.

Left ventricular systolic function is mildly reduced.

Grade I diastolic dysfunction noted.

There are regional wall motion abnormalities noted.

The left atrium is mildly dilated.

The left atrial volume is increased.

There is trace mitral regurgitation.

There is mild tricuspid regurgitation.

The right ventricular systolic pressure is 23-28 mmHG.

The aortic valve is trileaflet.

Trace aortic regurgitation.

There is no pericardial effusion.

There is severe posterior wall hypokinesis.

Left Ventricle

The left ventricle is grossly normal size.  There is normal left ventricular wall thickness.  Left ventricular systolic function is mildly reduced.  The left ventricular ejection fraction is approximately 45-50%.  Grade I diastolic dysfunction noted.  There are regional wall motion abnormalities noted. There is severe posterior wall hypokinesis.

Right Ventricle

The right ventricle is grossly normal size.  The right ventricular systolic function is normal.

Atria

The left atrium is mildly dilated.  The left atrial volume is increased.  Right atrial size is normal.  There is a catheter/pacemaker lead seen in the right atrium.  There is no Doppler evidence for an atrial septal defect.

Mitral Valve

The mitral valve is grossly normal.  There is no mitral valve stenosis.  There is trace mitral regurgitation.

Tricuspid Valve

The tricuspid valve is not well visualized, but is grossly normal.  There is no tricuspid stenosis.   There is mild tricuspid regurgitation.   The right ventricular systolic pressure is 23-28 mmHG.

Aortic Valve

The aortic valve is trileaflet.  There is no aortic stenosis noted at this time. Trace aortic regurgitation.

Pulmonic Valve

The pulmonic valve is not well seen, but is grossly normal.  There is no pulmonic valvular regurgitation.

Great Vessels

The aortic root is normal size.

Pericardium/Pleural

There is no pericardial effusion.

Doc. No. 20-4 at 63-64.  Plaintiff returned to Easterling that same day.  Doc. No. 14-1 at 24.  Pursuant to the "Provider Consultation Report," Plaintiff received a wound check and echocardiogram.   Doc. No. 14-1 at 27.   The notes further assert: "no redness," "no drainage," and that Plaintiff would be scheduled for a 6-week device check.  *Id*.

Plaintiff received the following response to his February 4 grievance on February 13, 2020: "This issue was discussed with you on 2/13/2020. You received the appropriate care for your medical issue. If you have any more issues, please let me know. Have a blessed day." Doc. No. 20-1 at 8.

The next day, Plaintiff completed another medical grievance. Doc. No. 20-1 at 9. While the grievance is "checked" as a "medical grievance appeal," Plaintiff titles his grievance as an "amended grievance under 42 U.S.C. 1997(e)." *Id*. In this grievance, Plaintiff asserts:

> On 2/05/20 the implanted device was surgically implaced [sic] by Dr. Ahmed because of a delay in surgical procedure that was almost 2 years past its due date, putting me at risk of a massive heart attack or threatening death experience from this delay which [is] a violation of my 8th and 14th amendment right to standard care from [Defendants Corizon, LLC and Wexford] and the doctors at HCU (officials). This conduct and intentional delay and reckless conduct describes conduct so dangerous that deliberate nature is inferred. The doctors ignored and delayed a serious medical need at which this delay could have cost me my life at which I am fighting to regain.

*Id*. Before Easterling's Health Services Administrator, Mona Payne, could respond to his grievance, Plaintiff filed an appeal. Doc. No. 20-1 at 3; *see also id*. at 10-12. Plaintiff received a response to his February 14 grievance on February 25, 2020. Doc. No. 20-1 at 9. In her response, Payne explained: "Per our conversation today, this is confirmation that you were not asking for anything or expecting anything. Your words were 'I just wanted you to be informed.'" *Id*.

On March 2, 2020, Plaintiff received a chest x-ray. Doc. No. 20-4 at 61. The radiologist read the report as:

Reason for exam: Routine CXR

Findings: The lungs are clear.  No focal infiltrate or involving mass. Pacemaker is noted.  The costophrenic angles are sharp, without evidence for effusion.  Heart size and mediastinal contours are within normal limits. There are no osseous abnormality identified.

Impression: No infiltrate, effusion, or acute findings identified.

*Id.*

On March 23, 2020, at approximately 3:10 p.m., medical personnel treated Plaintiff for chest pains.  Doc. No. 20-4 at 73-74.

In March 2020, Defendant Wilson ceased being the Medical Director at Easterling. Doc. No. 20-3 at 2.

As of April 6, 2020, Payne has "heard nothing further from [Plaintiff].  To our knowledge, [Plaintiff] did not have any further issues subsequent to my response to [Plaintiff's] medical grievance on February 25, 2020.  [Plaintiff] did not make any further filings and we did not hear anything from [Plaintiff] with regard to his medical grievance. [Plaintiff] did not request a meeting with me, the HSA and the warden pursuant to the grievance policy."  Doc. No. 20-1 at 4.

Further facts are set forth as necessary.

## III.    Standard of Review

In addressing the exhaustion requirements of 42 U.S.C. § 1997e, the Eleventh Circuit has

recognized that [t]he plain language of th[is] statute makes exhaustion a precondition to filing an action in federal court. This means that until such administrative remedies as are available are exhausted, a prisoner is precluded from filing suit in federal court.

*Leal v. Georgia Dept. of Corrs.*, 254 F.3d 1276, 1279 (11th Cir. 2001) (citations and internal quotations omitted).   Furthermore, the law is well-settled that "the question of exhaustion under the PLRA [is] a 'threshold matter' that [federal courts must] address before considering the merits of the case," and that cannot be waived.  *Myles v. Miami-Dade Cnty. Corr. & Rehab. Dept.*, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004)).

> When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed. If the complaint is not subject to dismissal at this step, then the court should make specific findings in order to resolve the disputed factual issues related to exhaustion.

*Myles*, 476 F. App'x at 366 (citations and internal quotations omitted).  Consequently, a district court "may resolve disputed factual issues where necessary to the disposition of a motion to dismiss for failure to exhaust [without a hearing].  The judge properly may consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and the parties have a sufficient opportunity to develop the record." *Trias*, 587 F. App'x at 535.  Based on the foregoing, the Eleventh Circuit has rejected an inmate-plaintiff's argument that "disputed facts as to exhaustion should be decided" only after a trial either before a jury or judge. *Id.* at 534.

## IV.    Discussion

Plaintiff alleges Defendants acted deliberately indifferent to his serious medical needs.  Defendants deny Plaintiff's allegations and maintain this case is subject to dismissal

because Plaintiff failed to exhaust the administrative remedy provided at Easterling prior to filing this complaint as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Federal law directs this Court to treat Defendants' responses as a motion to dismiss for failure to exhaust an administrative remedy and allows the Court to look beyond the pleadings to relevant evidentiary materials in deciding the issue of proper exhaustion. *Bryant*, 530 F.3d at 1375.

The Prison Litigation Reform Act compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court under § 1983 or any other Federal law. Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "Congress has provided in § 1997(e)(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "The PLRA strengthened [the exhaustion] provision [applicable to inmate complaints] in several ways. Exhaustion is no longer left to the discretion of the district court, but is mandatory. Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards. Indeed, as [the Supreme Court] held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought–monetary damages–cannot be

granted by the administrative remedies." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (internal citation omitted).

Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement. *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Ross v. Blake*, ⸺ U.S. ⸺, 136 S. Ct. 1850, 1857, 195 L. Ed. 2d 117 (2016). However, "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. Generally, a remedy is "available" when it has " 'sufficient power or force to achieve an end,' [or is] 'capable of use for the accomplishment of a purpose[.]'" *Booth*, 532 U.S. at 737. Moreover, "the PLRA exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings.... Construing § 1997e(a) to require proper exhaustion ... fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage." *Id.* at 90-91, 93. The Supreme Court reasoned that because proper exhaustion of administrative remedies is necessary an inmate cannot "satisfy the Prison Litigation Reform Act's exhaustion requirement ... by filing an untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative

process simply by waiting until the grievance procedure is no longer available to him. *Id.* at 83-84; *Bryant*, 530 F.3d at 1378 (To exhaust administrative remedies in accordance with the PLRA, prisoners must "properly take each step within the administrative process."); *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA); *Higginbottom v. Carter*, 223 F.3d 1256, 1261 (11th Cir. 2000) (inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry*, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam).

It is undisputed Easterling provides an administrative remedy for inmate complaints in the form of an inmate grievance procedure. Docs. No. 20-1, 85-1, 85-2. The undisputed evidentiary materials filed by Defendants demonstrate Plaintiff had access to the grievance procedure while confined in Easterling. When Defendant Corizon held the contract with ADOC to provide health care related services to Alabama state incarcerated inmates, the medical grievance procedure allowed inmates to submit grievances to Payne, as the Health Services Administrator, who acted as "custodian of all grievances filed by inmates at [Easterling]." Doc. No. 85-1.[7] Under Defendant Wexford's contract, Easterling's

---

[7] Defendant Corizon held the contract with the ADOC to provide health care related services to Alabama state incarcerated inmates from November 1, 2007 through March 31, 2018. *See* Doc. No. 7 at 1. Defendant Wexford has held the contract with the ADOC to provide health care related services to Alabama state incarcerated inmates since April 1, 2018. Doc. No. 20-3 at 2.

Ombudsman responds to all medical grievances. *Id.* at 2. If the inmate appeals, the

Ombudsman then notifies both the Health Services Administrator and the inmate of a

hearing date and time regarding the appeal. *Id.*

The relevant portion of the grievance procedure reads as follows:

1. Grievance forms are located in the HCU for the patient to pick up. After filling out a request and receiving it back with a response, should the inmate not be satisfied, he can also send a request asking to be sent a grievance form.

2. Once completed, the inmate places all written grievances in the locked box located outside the chow hall or sends it through the on-site ADOC Mail. The locked box is brought to the HCU each day at approximately 10:00 AM. A nurse unlocks the box, retrieves the request forms, and they are given to the H.S.A., DON in the absence of the H.S.A. The H.S.A. stamps the request with the date received.

3. MH related grievances are stamped with the date received and placed in the MH box located in medical records. The MH Nurse will pick up grievances daily. MH will log, respond, and track all MH related grievances.

4. The H.S.A./DON may conduct a face to face interview and/or conduct a records review in preparing a written response to the grievance.

5. All grievances must be answered by the H.S.A./DON within five working days of receiving the grievance.

6. Once the response has been written onto the grievance form, it will be logged in the grievance log accordingly.

7. If the inmate appeals the grievance response, and submits a grievance appeal, the H.S.A./DON will answer in writing, within three working days. A face to face interview with the inmate will be conducted at this time.

8. Once the H.S.A/DON has conducted the appropriate review, inmate interview, and a written response, the grievance appeal response is logged onto the grievance appeal log. It is then placed in the ADOC mailbox and they distribute the grievance appeal back to the appropriate inmate.

9. If the inmate is not satisfied with the response, then a face to face encounter with the H.S.A/DON, and Warden or designee must take place.

Doc. No. 85-2 at 5-7; *see also* Doc. No. 20-1 at 3.

The record before the Court, including the undisputed evidentiary materials filed by Defendants, demonstrates that an administrative remedy was available to Plaintiff during his confinement at Easterling.  These materials further establish that Plaintiff failed to properly exhaust the remedy prior to filing this federal civil action.  Specifically, despite the availability of a grievance procedure and his access thereto, Plaintiff failed to exhaust his administrative remedies when he failed to pursue his remedies after receiving timely responses from Payne.  Plaintiff further fails to show that he ever met with Payne and the warden after receiving a response to any alleged appeal.  *See* Doc. No. 20-1.  Plaintiff does not dispute this evidence, but nonetheless maintains he fully exhausted the grievance process.  *See e.g.* Doc. No. 94 at 3-15.  Further, upon review of the evidence, Plaintiff's grievances relating to the claims asserted in this complaint were filed *after* Plaintiff filed his February 3, 2020, complaint.  *See* Doc. No. 20-1 at 8-12; Doc. No. 51-1 at 3-6; Doc. No. 94-1 at 1; Doc. No. 94-2 at 1.  Yet, "the PLRA mandates early judicial screening of prisoner complaints and requires prisoners to exhaust prison grievance procedures *before* filing suit." *Jones v. Bock*, 549 U.S. 199, 202 (2007) (citing 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(a)) (emphasis added).

It is likewise clear the administrative remedy is no longer available to Plaintiff as he is no longer incarcerated.  Consequently, dismissal with prejudice is appropriate. *Bryant* 530 F.3d at 1375 n.1; *Johnson*, 418 F.3d at 1157*; Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a dismissal with prejudice, a prisoner could evade the

exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004) (footnotes omitted) (holding that inmate's "federal lawsuits [were] properly dismissed with prejudice" where previously available administrative remedies had become unavailable).

## V.     Conclusion

For the reasons set forth herein, it is ORDERED as follows:

1. Defendants' motions to dismiss (Doc. No. 9; Doc. No. 20-1; Doc. No. 69; Doc. No. 70; Doc. No. 73; Doc. No. 120) are GRANTED.

2. Plaintiff's claims against Defendants Wexford Health Sources, Inc.; Dr. Jean Darbouze; Dr. Philip Wilson; Dr. Richard Perryman; Dr. Hugh Hood; and Richard Hallworth are hereby DISMISSED with prejudice in accordance with the provisions of 42 U.S.C. § 1997e(a) for Plaintiff's failure to properly exhaust an administrative remedy before seeking relief from this court.

DONE this 6th day of February, 2023.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE