IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RONALD ARMBRESTER,           )
                             )
        Plaintiff,           )
                             )
    v.                       )          CASE NO. 2:20-cv-77-JTA
                             )
CORIZON, LLC, et al.,        )           (WO)
                             )
        Defendants.          )

## MEMORANDUM OPINION AND ORDER

Pro se Plaintiff, Ronald Armbrester, who is no longer confined, filed this civil rights action pursuant to 42 U.S.C. § 1983, seeking relief for alleged violations of his federally protected rights. This action involves a dispute over the adequacy of medical care and treatment afforded Plaintiff during his incarceration at Easterling Correctional Facility ("Easterling"), in Clio, Alabama.  Docs. No. 1, 49, 59.  Plaintiff alleges Defendants delayed replacing his heart defibrillator, resulting in a medical emergency in which Plaintiff "went into cardiac arrest" with a heartbeat of 230 beats per minute and causing his defibrillator to use "the last of its reserved power to stop [Plaintiff] from a massive heart attack."  Doc. No. 1 at 5.

Plaintiff names as the defendants: (1) Wexford Health Solutions, Inc. ("Wexford"); (2) Dr. Jean Darbouze; (3) Dr. Philip Wilson; (4) Corizon, LLC ("Corizon"); (5) Dr. Richard Perryman; (6) Dr. Hugh Hood; and (7) Richard Hallworth, former Chief Executive

Officer of Corizon, LLC.  Docs. No. 1, 49, 59.[1]  Plaintiff asserts the defendants were deliberately indifferent to his serious medical needs and requests injunctive relief and monetary damages as relief.   Doc. No. 1 at 13.

This Opinion addresses Plaintiff's allegations asserted against Defendant Corizon. Plaintiff's allegations against the other Defendants are addressed by a separate Opinion.[2]

Defendant Corizon filed an answer, special report, supplemental special reports, responses, and supporting evidentiary materials addressing Plaintiff's claims for relief. Docs. No. 20, 85, 87, 109, 110.  In these documents, Defendant Corizon denies it acted in violation of Plaintiff's constitutional rights.

The Court provided Plaintiff an opportunity to file a response to Defendant Corizon's special report.  Doc. No. 113.  The order required Plaintiff to file his response "in accordance with the directives of the Court's November 13, 2020, Order."  *Id.* (citing Doc. No. 89).  In the November 13, 2020, Order, the Court advised Plaintiff that his response should be supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  Doc. No. 89.  The order further cautioned Plaintiff that unless "sufficient legal cause" is shown within ten days of entry of this order "why such action should not be undertaken, ... the court may at any time [after expiration of the time for his filing a response to this order] and without further notice to the parties (1) treat the

---

[1] On March 25, 2020, this Court directed the Clerk to amend the court docket to reflect Defendant "Corizon Health Services" to be correctly identified as "Corizon, LLC."  Doc. No. 13.  On April 23, 2020, District Court Judge W. Harold Albritton adopted this Court's Recommendation, terminating Defendant Alabama Department of Corrections with prejudice.  Doc. No. 41.

[2] It appears that Plaintiff has abandoned his claims against all the defendants except for Wexford.  *See* Doc. No. 116. For the sake of completeness, the Court addresses the claims raised by Plaintiff against all the defendants.

special report and any supporting evidentiary materials as a [dispositive] motion ... and (2) after considering any response as allowed by this order, rule on the motion in accordance with the law." Doc. No. 89. Plaintiff filed no response to Defendant Corizon, LLC's special report.

Pursuant to the Court's Orders (Docs. No. 89, 113), the Court deems it appropriate to treat the report and responses filed by Defendant Corizon as a motion for summary judgment and resolves the motion in favor of Defendant Corizon.[3]

## I.    Plaintiff's Allegations

Plaintiff alleges, in February 2013, he was diagnosed with a heart disorder, requiring insertion of a St. Jude defibrillator implant. Doc. No. 1 at 8. To monitor his implant and heart condition, Plaintiff explains he was provided a defibrillator monitor. *Id*. Plaintiff alleges, after his incarceration in June 2013, while housed at Kilby Correctional Facility, Kilby staff "displaced" Plaintiff's monitor and the monitor was lost. *Id*.

Plaintiff was later transferred to the Fountain Correctional Facility, and in August 2016, was taken to the Health Care Unit due to an accelerated heartbeat and high blood pressure. *Id*. at 9. Plaintiff alleges his blood pressure remained high while incarcerated at Fountain. *Id*.

In January 2017, Plaintiff was transferred to Easterling. *Id*. Plaintiff alleges Defendant Corizon the contract medical provider and Defendant Darbouze, a physician at Easterling, knew of Plaintiff's implant, and while Defendant Darbouze told Plaintiff a

---

[3] Upon consent of the parties, the case was referred to the United States Magistrate Judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c). Doc. No. 118.

monitor would be ordered, Plaintiff never received a replacement for his lost St. Jude monitor.  *Id*.

Approximately one year later, in January 2018, Plaintiff maintains, notwithstanding Defendant Perryman's knowledge of Plaintiff's recurrent chest pain, Defendant Perryman delayed or failed to monitor Plaintiff's implant.  Doc. No. 49 at 2.

Plaintiff alleges in 2019, after Defendant Wexford replaced Defendant Corizon as the medical care provider for the Alabama Department of Corrections ("ADOC"), Defendant Wilson also learned of Plaintiff's implant and its import to Plaintiff's health. Doc. No. 1 at 9-10.

Plaintiff maintains, Defendants' deliberate indifference and failure to monitor Plaintiff's implant led to a medical incident on December 22, 2019, in which he went into cardiac arrest.  *Id*. at 5.  Plaintiff asserts Defendants, "had prior knowledge that [Plaintiff] had a [serious] medical need[] that was delayed, ignored that the [defibrillator] had to be monitored, changed at [an] appropriate time, that the device was riding on reserved power for almost (2) years and had a dead line to be changed because the battery life had reach[ed] its exspected in [sic], and went unattended, unnoticed, and unevaluated."  Doc. No. 49 at 2.  Plaintiff appears to allege, in part, Defendants' failure to properly monitor his implant was caused by Defendants Corizon and Wexford's cost-saving policies or customs.  *Id*. at 1.

Defendant Corizon denies Plaintiff's allegations of deliberate indifference and unconstitutional policy or custom.

## II.     Factual Background

In April 2013, an implant device was placed in Plaintiff's chest.  Doc. No. 20-3 at

3; Doc. No. 20-4 at 54.[4]  On August 5, 2013, Plaintiff was incarcerated with the ADOC.

Doc. No. 20-3 at 2.  The next day, Plaintiff received a chest x-ray.  Doc. No. 20-3 at 4-6;

*see also* Doc. No.  20-4 at 72.  The radiologist read the x-rays as follows:

> Exam: Chest – 1 view (AP)
>
> Results:   The lungs are clear without evidence of focal pneumonia, pneumothorax, edenopathy or effusion.  The cardiomediastinal contours and bony structures are within normal limits.  No acute or chronic rib fractures. No mid-line shift of structures identified.  There is a pacemaker in position.
>
> Conclusion:   Clear lungs without evidence of acute cardiopulmonary findings.

Doc. No. 40-4 at 72.

Since his incarceration, Plaintiff has been treated by the ADOC chronic care clinic.

Doc. No. 20-3 at 3; *see also* Doc. No. 20-4 at 33.  To treat and monitor his heart condition,

Plaintiff has been seen regularly by ADOC medical staff and outside physicians.  *See*

*generally*, Doc. No. 20-4.

In December 2016, Defendant Darbouze, previously employed by Defendant

Corizon as the Medical Director at Easterling, left his employment.  Doc. No. 20-2 at 1.

Defendant Darbouze has not been employed at Easterling in any capacity as a medical

doctor since December 2016.  *Id*. at 2.

Plaintiff's medical records show, on August 15, 2017, medical personnel signed a

---

[4] Doc. No. 20-3 is Defendant Wilson's affidavit.  Defendant Wilson's testimony as to Plaintiff's medical history is supported by Plaintiff's uncontroverted medical records.

"Refusal of Clinical Services" form due to Plaintiff's failure to appear for two chronic care medical appointments scheduled for August 7, 2017, and August 14, 2017. Doc. No. 20-4 at 85.

On January 8, 2018, medical personal again signed a "Refusal of Clinical Services" form due to Plaintiff failing to appear for two chronic care medical appointments scheduled for December 18, 2017, and January 8, 2018. Doc. No. 20-4 at 84.

On January 12, 2018, Plaintiff's medical records show that Defendant Perryman, then Easterling's Medical Director, ordered Plaintiff a nuclear medicine cardiac stress test. Doc. No. 20-3 at 3; *see also* Doc. No. 20-4 at 43-45. "The note reflects that [Plaintiff] had a 10 day history of recurrent chest pain. [Plaintiff] had no relaxed chest pain. An EKG was taken." Doc. No. 20-3 at 3; *see also* Doc. No. 20-4 at 45.

On February 5, 2018, Plaintiff was seen by an outside physician at River Region Cardiology. Doc. No. 20-3 at 4; *see also* Doc. No. 20-4 at 40-41. The cardiologist noted:

Exercise stress report with gaited spect nuclear imaging.

Stress procedure: Patient's resting heart rate was 60 beats per minute. Resting blood pressure was 149/68. Resting EKG showed an A-sensed, V-placed rhythm. Patient was then exercised on a Bruce protocol. He was able to exercise for 7 minutes. He reached a peak heart rate of 162 beats per minute, which is 94% of his age predicted maximal heart rate. At peak exercise, he did not report any chest pain. At peal exercise, we did not observe any EKG changes to indicate ischemia. Isolated PPCs were observed during the test. Myoview was injected at 6 minutes into the exercise.

Impression:
1. Clinically negative stress test.
2. Electrically negative stress test.
3. Myoview images are pending. The report will be dictated separately.

Doc. No. 20-4 at 41.  The nuclear camera/imaging notations from that same date, state as follows:

> Nuclear camera/imaging: IS2 Pulse with mirage processing.

> Previous nuclear:

> Nuclear procedure:  Resting images were acquired after injecting the patient with 4.04 mCi of Thallium 201.  Resting images show uniform uptake of the tracer by all Myocardial segments except the inferior wall and apex, which shows a large, mild-intensity defect.  Post-exercise images required after injecting the patient with a 33.4 mCi of Tc 99 myoview.  Post-exercise images again show a large inferior wall defect, which is moderate to severe intensity.  A gaited analysis shows an injection fraction of 46%.  Wall motion analysis shows mild to moderate global hypokinesis.

> Impression:

> 1.  A large fixed inferior wall defect is noted, which may possibly represent a scar from a previous myocardial infarction.  Know that the segments were also mild-to-moderate hypokinetic.  We did not see any degree of reversibility to suggest ischemia.
> 2.  Mild to moderate global hypokinesis.
> 3.  An ejection fraction of 46%.

*Id*. at 40.

On March 14, 2018, Plaintiff was scheduled to meet an outside physician.  Doc. No. 20-4 at 83.  Because Plaintiff failed to report to the Health Care Unit, however, this appointment was cancelled.  *Id.*

On April 1, 2018, Defendant Wexford became the ADOC's contract healthcare provider to provide medical care to incarcerated Alabama state inmates and on February 21, 2019, Defendant Wilson became the Medical Director at Easterling.  Doc. No. 20-1 at 1-2; Doc. No. 20-3 at 2.

On March 6, 2019, Plaintiff filed a medical grievance regarding medications

allegedly not provided to him at pill call.  Doc. No. 20-1 at 2, 6.  Plaintiff received the following response to his grievance on March 8, 2019: "Thank you for bringing this to our attention.  This [] will be investigated.  I do apologize for any inconvenience and any delay.  Please let me know if this issue continues.  Have a blessed day."  Doc. No. 20-1 at 6.

On July 27, 2019,[5] Plaintiff completed a medical grievance relating to his health care code within the ADOC system.  Doc. No. 20-1 at 2, 7. Plaintiff received the following response to his grievance on July 31, 2019: "Yes, the Provider did change your healthcare code at a "1."  Unfortunately, it wasn't changed in the computer.  It has been changed today.  I do apologize for the delay.  Have a blessed day!"  Doc. No. 20-1 at 7.

Plaintiff's medical records show, at approximately 12:36 p.m. on December 21, 2019, Plaintiff reported to Easterling's Health Care Unit, complaining of chest pains.  Doc. No. 20-4 at 76.  Defendant Wilson referred Plaintiff to Dale Medical Center in Ozark, Alabama for treatment.  Doc. No. 14-1 at 6.  Shortly thereafter, Plaintiff was transferred to Dale Medical Center.  Doc. No. 20-4 at 60, 77.

At approximately 2:43 p.m., Plaintiff was seen and examined by Dale Medical Center's emergency room physicians.  Doc. No. 14-1 at 2; *see also* Doc. No. 20-4 at 66. Plaintiff was deemed to have an "emergency medical condition," "requiring emergency evaluation, treatment and/or stabilization."  Doc. No. 14-1 at 10.

The radiology report asserts the following findings as to Plaintiff's chest:

Chest 1 View

---

[5] While Plaintiff dated this grievance as July 27, 2018, upon review of the grievance, the accurate year is 2019.

Reason for Procedure(s): Syncope

Chest, Single View:

Findings: Left subclavian approach pacing device is in expected position. The lungs are clear.  The heart size if normal.

Impression: No acute findings.

Doc. No. 20-4 at 66.  While at Dale Medical Center, Plaintiff also received a CT for his "Head/Brain."  *Id*. at 67.  The radiology report asserts as follows:

CT Head/Brain W/O Contras

Reason for Procedure(s): Syncope

CT SCAN OF THE BRAIN WITHOUT CONTRAST:

Findings: No intracranial mass, mass effect, hemorrhage, hydrocephalus, extraaxial fluid collection or acute CVA.  Calvarium is intact.  Mastoid air cells and sinuses are clear.

Impression: No acute intracranial abnormality.

All CT Scans performed at this location utilize dose optimization techniques as appropriate to performed exam.

*Id*.  Plaintiff returned to Easterling that same day.  Doc. No. 14-1 at 3; Doc. No. 20-4 at 66.

On January 17, 2020, Plaintiff was sent to see a cardiology expert.  Doc. No. 14-1 at 3, 13.  The report from the cardiologist states as follows:

Review of case

> (1)   ICD shock-device interrogation showed VFIB
>
> (2)   Hypertension
>
> (3)   Ischemic cardiomyopathy
>
> (4)   End of life battery on ICD

Doc. No. 14-1 at 3, 12.   The cardiologist provided the following diagnosis and prescriptions:

- Change aspirin 8 mg. PO daily.

- Atona Statin 40 mg. PO daily.

- Change Losagtan to 50 mg. PO daily.

- Start Metoprolol XL 50 mg. PO daily.

- Echocardiogram for ischemic cardiomyopathy.

- Schedule for ICD generator change w/Dr. Ahmed ASAP.

- No institutional work/job.

- Needs ICD remote monitor.

*Id*. at 3, 12.  Plaintiff returned to Easterling that same day.  *Id*. at 3, 15.  Plaintiff saw Defendant Wilson three days later, who approved all recommendations made by the cardiologist.  *Id*. at 3, 12.

On January 27, 2020, Plaintiff signed the instant complaint, alleging deliberate indifference to his serious medical needs.  *See* Doc. No. 1 at 13.  Plaintiff's complaint was filed in this Court on February 3, 2020. *Id*.

Also on February 3, Plaintiff complained to Easterling medical personnel that he suffered palpitations.  Doc. No. 14-1 at 4, 16.  The notes from Plaintiff's medical records show that Plaintiff mentioned that his issues "could be anxiety related" and that his vital signs were normal.  *Id*. at 4, 16.

The next day, Plaintiff completed a medical grievance relating to his defibrillator

and a medical incident that occurred on December 27, 2019.[6]  Doc. No. 20-1 at 2, 8.  In his

grievance, Plaintiff alleges:

> On December 27, 2019, [Plaintiff's] heart rate according to the cardiologist
> report that his heart rate was 230 beats a minute, in danger of a massive heart
> attack.  The cardiologist call[ed] a St. Jude representative on 1-17-2020 and
> he did a check of the St. Jude [defibrillator] that had been place[d] in
> [Plaintiff's] chest on 2-27-2013 and the test results found that [Plaintiff's]
> [defibrillator] implant was riding on a reserved power for almost 2 years and
> was out of power on a last attempt to regulate [Plaintiff's] heart with last of
> its power to put [Plaintiff's] heart back in rhythm, the cardiologist told
> [Plaintiff] that [Plaintiff] could have died from a fatal heart attack, and [his]
> dead [defibrillator] put [him] at risk of a massive heart attack.  2-4-2020
> [Defendant Wilson] said that [Plaintiff] could have rode [sic] on a dead
> [defibrillator] for three (3) years before it had to be replaced.  [Plaintiff] told
> him that [Plaintiff] was in fear of [Plaintiff's] life and had thought of writing
> [Plaintiff's] last will in testament on the 4th of February 2020.

Doc. No. 20-1 at 8.

On February 5, 2020, Plaintiff's ICD generator was changed by Dr. Ahmed at River

Region Cardiology.  Doc. No. 14-1 at 4, 17.  Plaintiff was discharged from Easterling's

infirmary the next day.  Doc. No. 20-4 at 88.  On February 6, 2020, Easterling medical

personnel directed Plaintiff to avoid heavy lifting and excessive use of his left arm for two

weeks and to sleep in a bottom bunk for six months.  Doc. No. 20-4 at 56-57.

On February 10, 2020, Plaintiff was transferred to River Region Cardiology for an

"Echo and ICD remote monitor."  Doc. No. 14-1; *see also* Doc. No. 20-4 at 63.  The

echocardiogram report provides the following summary:

> Reason for Study: Ischemic cardiomyopathy

---

[6] While Plaintiff asserts the date of the alleged medical incident to be December 27, 2019, it appears from the record,
that this grievance relates to Plaintiff's medical treatment on December 21, 2019.

Interpretation Summary

A complete two-dimensional transthoracic echocardiogram was performed (2D, M-mode, Doppler and color flow Doppler).

The left ventricular ejection fraction is approximately 45-50%.
Left ventricular systolic function is mildly reduced.

Grade I diastolic dysfunction noted.

There are regional wall motion abnormalities noted.

The left atrium is mildly dilated.

The left atrial volume is increased.

There is trace mitral regurgitation.

There is mild tricuspid regurgitation.

The right ventricular systolic pressure is 23-28 mmHG.

The aortic valve is trileaflet.

Trace aortic regurgitation.

There is no pericardial effusion.

There is severe posterior wall hypokinesis.

Left Ventricle

The left ventricle is grossly normal size.  There is normal left ventricular wall thickness.  Left ventricular systolic function is mildly reduced.  The left ventricular ejection fraction is approximately 45-50%.  Grade I diastolic dysfunction noted.  There are regional wall motion abnormalities noted. There is severe posterior wall hypokinesis.

Right Ventricle

The right ventricle is grossly normal size.  The right ventricular systolic function is normal.

Atria

The left atrium is mildly dilated.  The left atrial volume is increased.  Right atrial size is normal.  There is a catheter/pacemaker lead seen in the right atrium.  There is no Doppler evidence for an atrial septal defect.

Mitral Valve

The mitral valve is grossly normal.  There is no mitral valve stenosis.  There is trace mitral regurgitation.

Tricuspid Valve

The tricuspid valve is not well visualized, but is grossly normal.  There is no tricuspid stenosis.  There is mild tricuspid regurgitation.  The right ventricular systolic pressure is 23-28 mmHG.

Aortic Valve

The aortic valve is trileaflet.  There is no aortic stenosis noted at this time. Trace aortic regurgitation.

Pulmonic Valve

The pulmonic valve is not well seen, but is grossly normal.  There is no pulmonic valvular regurgitation.

Great Vessels

The aortic root is normal size.

Pericardium/Pleural

There is no pericardial effusion.

Doc. No. 20-4 at 63-64.  Plaintiff returned to Easterling that same day.  Doc. No. 14-1 at 24.  Pursuant to the "Provider Consultation Report," Plaintiff received a wound check and echocardiogram.  Doc. No. 14-1 at 27.  The notes further assert:  "no redness," "no drainage," and that Plaintiff would be scheduled for a 6-week device check.  *Id*.

Plaintiff received the following response to his February 4 grievance on February 13, 2020: "This issue was discussed with you on 2/13/2020.  You received the appropriate care for your medical issue.  If you have any more issues please let me know.  Have a blessed day."  Doc. No. 20-1 at 8.

The next day, Plaintiff completed another medical grievance.  Doc. No. 20-1 at 9. While the grievance is "checked" as a "medical grievance appeal," Plaintiff titles his grievance as an "amended grievance under 42 U.S.C. 1997(e)."  *Id*.  In this grievance, Plaintiff asserts:

> On 2/05/20 the implanted device was surgically implaced [sic] by Dr. Ahmed because of a delay in surgical procedure that was almost 2 years past its due date, putting me at risk of a massive heart attack or threatening death experience from this delay which [is] a violation of my 8th and 14th amendment right to standard care from [Defendants Corizon, LLC and Wexford] and the doctors at HCU (officials).  This conduct and intentional delay and reckless conduct describes conduct so dangerous that deliberate nature is inferred.  The doctors ignored and delayed a serious medical need at which this delay could have cost me my life at which I am fighting to regain.

*Id*.  Before Easterling's Health Services Administrator, Mona Payne, could respond to his grievance, Plaintiff filed an appeal.  Doc. No. 20-1 at 3; *see also id*. at 10-12.  Plaintiff received a response, however, to his February 14 grievance on February 25, 2020.  Doc. No. 20-1 at 9.  In her response, Ms. Payne explained: "Per our conversation today, this is confirmation that you were not asking for anything or expecting anything.  Your words were "I just wanted you to be informed."  *Id*.

On March 2, 2020, Plaintiff received a chest x-ray.  Doc. No. 20-4 at 61.  The radiologist read the report as:

Reason for exam: Routine CXR

Findings: The lungs are clear.  No focal infiltrate or involving mass. Pacemaker is noted.  The costophrenic angles are sharp, without evidence for effusion.  Heart size and mediastinal contours are within normal limits. There are no osseous abnormality identified.

Impression: No infiltrate, effusion, or acute findings identified.

*Id*.

On March 23, 2020, at approximately 3:10 p.m., medical personnel treated Plaintiff for chest pains.  Doc. No. 20-4 at 73-74.

In March 2020, Defendant Wilson ceased being the Medical Director at Easterling. Doc. No. 20-3 at 2.

As of April 6, 2020, Payne has "heard nothing further from [Plaintiff].  To our knowledge, [Plaintiff] did not have any further issues subsequent to my response to [Plaintiff's] medical grievance on February 25, 2020.  [Plaintiff] did not make any further filings and we did not hear anything from [Plaintiff] with regard to his medical grievance. [Plaintiff] did not request a meeting with me, the HSA and the warden pursuant to the grievance policy."  Doc. No. 20-1 at 4.

Further facts are set forth as necessary.

## III.   Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th

Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof.  *Id.* at 322-324.

When a defendant meets their evidentiary burden, as Defendant Corizon has here, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint when considering summary judgment).  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable

factfinder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Only disputes involving material facts are relevant, materiality is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  At the summary judgment stage, this Court should accept as true "statements in [Plaintiff's] verified complaint, [any] sworn response to the [Defendants'] motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 2019 WL 1785355, *3 (11th Cir. April 24, 2019); *see also United States v. Stein,* 881 F.3d 853 (11th Cir. 2018) (holding that a plaintiff's self-serving and uncorroborated, but not conclusory, statements in an affidavit or deposition may create

an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'").  However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the Court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, a plaintiff's pro se status alone does not mandate the Court disregard elementary principles of production and proof in a civil case.  Here, Plaintiff fails to demonstrate a requisite genuine dispute of material fact to preclude summary judgment on his claims against Defendant Corizon, LLC.  *See Matsushita*, 475 U.S. at 587.

## IV.     Discussion

Plaintiff alleges Defendant Corizon acted deliberately indifferent to his serious medical needs.  Plaintiff also appears to allege Defendant Corizon is liable for Defendant Darbouze's deliberate indifference in failing to provide Plaintiff with a replacement St. Jude monitor.  Doc. No. 1 at 9.  Defendant Corizon denies Plaintiff's allegations and further argues Plaintiff fails to show any unconstitutional policy or custom causing the constitutional violations claimed by Plaintiff.  *See* Doc. No. 109.

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of his constitutional rights.  In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

The law is settled that, generally, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."  *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quotation marks and citation omitted).  The Eleventh Circuit has extended that rule to private corporations like Defendant Corizon.  *See, e.g.*, *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310

(11th Cir. 2011).  Where the state and the entity enter such a contractual agreement, the private healthcare company is a "person" acting under color of state law, and thus may be liable under § 1983.  *Howell v. Evans*, 922 F.2d 712, 723-24 (11th Cir.) *vacated pursuant to settlement*, 931 F.2d 711 (11th Cir. 1991), *and opinion reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994) (internal citation omitted).  By virtue of the contract, the private entity also "performs a function traditionally within the exclusive prerogative of the state and becomes the functional equivalent of the municipality under section 1983."  *Craig*, 643 F.3d at 1310 (internal quotation marks omitted).  Accordingly, under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that a municipality cannot be held liable on a theory of *respondeat superior*), a private entity providing medical services to inmates pursuant to a contract with the state is only liable under § 1983 where it employs a custom or policy constituting deliberate indifference to an inmate's serious medical need.  *See Howell*, 922 F.2d at 724 n.13 (noting that the policy or custom analysis applied to a corporation is the same as the analysis applied to municipalities under *Monell*).  To hold a defendant liable as a supervisory official, a plaintiff must show that "the supervisor personally participate[d] in the alleged constitutional violation or [that] there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."  *Hartley*, 193 F.3d at 1269.

The challenged policy or custom need not be express.  A policy is "a decision that is officially adopted" or created on behalf of the entity.  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  A custom is any practice that is "so settled and permanent" as to carry the force of law.  *Id.*  To establish the existence of a custom, the

evidence must show more than an isolated incident leading to constitutional injury, and instead, must reflect the pattern is widespread. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). To show the practice at issue is sufficiently widespread to constitute a custom, a plaintiff ordinarily must produce evidence that the practice resulted in deficient treatment of other inmates. *See Craig*, 643 F.3d at 1312. Ultimately, the plaintiff must produce sufficient evidence of a "series of constitutional violations from which deliberate indifference can be inferred." *Id*. (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)).

On this record, Plaintiff has not produced sufficient evidence to establish a genuine dispute of material fact regarding whether Defendant Corizon implemented a policy or custom evidencing deliberate indifference to his serious medical needs. Specifically, Plaintiff produces no evidence of a custom or policy implemented by Defendant Corizon to withhold necessary medical care or treatment to save money nor evidence of a permanent widespread practice to deny necessary medical care or treatment to inmates to control costs. *See Craig*, 643 F.3d at 1310 (explaining that to impose liability under § 1983, a plaintiff must prove that a municipality had a "policy or custom" of deliberate indifference that led to the violation of his constitutional right). Defendant Corizon is, therefore, granted summary judgment on Plaintiff's Eighth Amendment claim. *See Hartley*, 193 F.3d at 1269.[7]

---

[7] While the Court grants Defendant Corizon's motion for summary judgment, to the extent Defendant Corizon seeks reimbursement of all costs and fees incurred in defense of this action (Doc. No. 109 at 12), this request is denied. "Under [42 U.S.C.] § 1988, a prevailing defendant is entitled to recover attorney's fees if 'the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" *Sibley v. Levy*, 203 F. App'x 279, 280–81 (11th Cir. 2006) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)). To

## V.      Conclusion

For the reasons set forth herein, it is ORDERED as follows:

1.  Defendant Corizon's motion for summary judgment (Docs. No. 20, 85, 87, 109, 110) is GRANTED.

2.  Plaintiff's claims against Defendant Corizon are hereby DISMISSED with prejudice.

DONE this 6th day of February, 2023.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE

---

determine "whether a suit is frivolous, a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Id*. (quoting *Sullivan v. Sch. Bd. of Pinellas County,* 773 F.2d 1182, 1189 (11th Cir. 1985)) (internal quotations and citation omitted).  "The three factors we have noted to be used in determining if a claim was frivolous are: '(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits.'"  *Id*. (quoting *Sullivan*, 773 F.2d at 1189). While the Eleventh Circuit acknowledges frivolous cases may be dismissed on summary judgment (*id*.), based on a review of the record, the Court does not find this case to be frivolous and will, therefore, deny Defendant Corizon's request for reimbursement.